UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

J.H.                                                                          PLAINTIFF

VS.                                          CIVIL ACTION NO. 3:16-cv-802-CWR-LRA

MANAGEMENT & TRAINING
CORPORATION and JOHN AND
JANE DOES 1-100                                                              DEFENDANTS

## MEMORANDUM OF AUTHORITIES IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Management & Training Corporation ("MTC"), by counsel and

pursuant to Rule 56 of the Federal Rules of Civil Procedure, and files this Memorandum of

Authorities in support of its Motion for Summary Judgment, as follows:

## INTRODUCTION

This case arises out of Plaintiff J.H.'s allegation that he was sexually assaulted on August

1, 2016, by another inmate on his housing unit at East Mississippi Correctional Facility ("EMCF").

Plaintiff at all relevant times was a post-conviction inmate in the custody of the Mississippi

Department of Corrections ("MDOC") serving a 15-year sentence for armed robbery. Defendant

MTC has operated EMCF under a contract with MDOC since July 2012.

Plaintiff asserts federal claims against MTC pursuant to 42 U.S.C. § 1983 for failing to

protect him from harm and for failing to adequately train, supervise, and discipline its security

personnel. *See* Amended Complaint [34], at ¶¶ 22, 13-16.[1] Plaintiff further asserts state law claims

for negligent hiring and supervision of its employees, and for *respondeat superior* for its employees'

allegedly deficient acts or omissions. *Id.*, at ¶¶ 17-19.

---

[1] The paragraphs contained in the Amended Complaint are numbered 1 through 22 and
then start over at 13 on Page 4.

As set forth below, there are no genuine issues of material fact that would preclude the entry of summary judgment in favor of MTC as to each of Plaintiff's claims against it.

## FACTUAL BACKGROUND

Plaintiff was transferred to EMCF in November 2015 after he was allegedly raped by another inmate while housed at Central Mississippi Correctional Facility. *See* Housing History, Exh. "A"; J.H. Deposition, Exh. "B," at 17:4-25. For the first seven-plus months following his arrival to EMCF, Plaintiff was housed in a single-man cell in "sheltered housing" in the medical department while he was treated for depression, anxiety, nightmares, and suicidal thoughts that he attributes to his prior sexual assault. *Id.*, at 21:24-23:25, 25:6-18. Plaintiff eventually requested to be moved from the EMCF medical department to general population. *See* Medical Record Excerpts, Exh. "C," at ___. On June 29, 2016, Plaintiff was moved to Unit 3, a general population zone that housed inmates being treated for serious mental health issues.[2] *See* Exh. "A"; Exh. "B," at 28:12-18. Plaintiff believed he was mentally stable at that time, and he did not have any problems with any of the inmates assigned to his zone. *See* Exh. "B," at 29:1-12.

Plaintiff claims that on or about July 30, 2016, Warden Shaw and several attorneys from the Southern Poverty Law Center made rounds on his zone. *See* Exh. "B," at 47:10-17, 51:17-23. Plaintiff claims he told Warden Shaw there had been inmates on his zone and that had been sexually assaulted and that he was scared it might happen to him, and Warden Shaw advised that he would look into it. *Id.*, at 51:24-52:14. Plaintiff testified he had seen an inmate named "Happy" engaged

---

[2] Unit 3 is divided into four zones, and Plaintiff was assigned to Unit 3-C. *See* Exh. "B," at 42:5-9. His zone had a big day room with tables and televisions, with approximately sixteen cells on each tier. *Id.*, at 39:12-25.

in sexual conduct with two other inmates in their cells and in the shower.[3] *Id.*, at 57:12-58:11. Plaintiff did not tell Warden Shaw which inmates had been involved in these alleged incidents, but he claims he had previously reported "Happy" to medical staff. *Id.*, at 63:4-7, 63:8-15. However, Plaintiff testified that no one on his unit had ever made any threats or sexual advances toward him personally. *Id.*, at 62:1-8, 63:1-3. Plaintiff also never requested to "red tag," or to be kept separate from, any of the inmates on that zone. *Id.*, at 68:17-19.

Plaintiff claims that on August 1, 2016, between 8 p.m. and 10 p.m.,[4] he and his cell mate went to the cell of Michael Wilson, which was located in the same corner of the top tier as his cell. *See* Exh. "B," at 65:11-17, 72:5-9. Inmates on Unit 3-C were allowed out of their cells from 5 a.m. to 11 p.m. *Id.*, at 43:17-25, 44:14-17. Plaintiff testified they initially just sat around talking about "war stories." 72:9-24. Plaintiff's cell mate eventually got up and left. *Id.*, at 75:24-25. Plaintiff claims Wilson then closed the door and punched him several times in the back of the head, knocking him to the floor. *Id.*, at 76:1-7. Wilson then pulled Plaintiff's pants down and pushed him to the side of the bottom bunk and started raping him. *Id.*, at 76:7-9. Plaintiff claims Wilson had some type of brick he kept hidden in a laundry bag and threatened to hit Plaintiff with it if he did not submit. *Id.*, at 68:24-69:2, 76:9-10. Plaintiff claims that after Wilson finished, Wilson went to his sink to clean up and Plaintiff returned to his own cell. *Id.*, at 81:7-10. Plaintiff testified he is not sure how long the incident lasted, whether it was one minute or ten. *Id.*, at 109:17-110:11. Plaintiff testified that he never yelled or screamed for help. *Id.*, at 81:11-14. Plaintiff knows of no witnesses to the assault.

---

[3] EMCF has no record of any reported sexual assaults occurring on Unit 3-C in July 2016.

[4] Plaintiff believes the subject incident occurred between 8 p.m. and 10 p.m. based on when security staff conducted formal count. *See* Exh. "B," at 70:20-71:14.

*Id.*, at 81:22-82:7.

Plaintiff testified he had never had any prior problems with Wilson. *See* Exh. "B," at 67:18-24 ("... no, no, no, no. We got along good."). Plaintiff had known Wilson since he arrived on Unit 3-C about a month earlier. *Id.*, at 65:9-10. Plaintiff testified that he and Wilson often spent time together on the zone talking, watching television, and playing cards. *Id.*, at 67:11-17. They also worked together for several hours every day on the same paint crew. *Id.*, at 66:6-21. Plaintiff considered Wilson his "friend." *Id.*, at 66:4-5. Wilson had never threatened Plaintiff. *Id.*, at 77:7-11. Plaintiff had never reported any problems with Wilson to prison officials. *Id.*, at 68:13-16. Plaintiff has no idea why Wilson sexually assaulted him. *See* Exh. "B," at 77:2-6.

There is no record of Wilson ever previously assaulting another inmate during his lengthy incarceration with MDOC, much less record of him engaging in sexual assault. *See* Wilson Incident History, Exh. "D."

Plaintiff claims there were no security officers on his zone at the time of the alleged incident. *See* Exh. "B," at 82:20-22. However, there was an officer posted in the Unit 3 control tower who could see into each zone and who also monitored each zone on Unit 3 through security cameras. *Id.*, at 42:10-12; Shift Roster, Exh. "E." According to the shift roster for that date, there also were two floor officers assigned to Unit 3 at that time of the alleged incident who were responsible for inmates on all four zones.[5] *See* Exh. "E."

Plaintiff testified he did not report the alleged sexual assault during pill call that night, nor did he report it when he went to the medical department that night for a breathing treatment.

_____

[5] Officer McClendon was assigned to the Unit 3 control tower at that time, while Sgt. Everett and Officer Seal were working as the Unit 3 floor officers. *See* Exh. "E."

*See* Exh. "B," at 86:8-23, 88:15-19.

Plaintiff claims that when cell doors were opened at 5 a.m. the next morning, he went to the wall phone in the day room and called the prison rape hotline to report the subject incident. *See* Exh. "B," at 88:20-23. Plaintiff claims that after shift change, he told Officer Ford he had been raped and requested to go to medical. *Id.*, at 89:22-90:1. According to Plaintiff, Officer Ford thought he was joking and did not appear to take him seriously.[6] *Id.* At about the same time, Officer Ford told him he needed to go to the law library for legal mail services. *Id.*, at 90:8-9. On his way, he ran into Nurse Edwards and told her about the alleged sexual assault. *Id.*, at 90:9-14. After he went to the library, Plaintiff went to medical where he was evaluated.[7] *Id.*, at 90:15-18. While Plaintiff was in medical, he also spoke with Investigator Lemarcus Ruffin and a mental health counselor. *Id.*, at 91:11-23. Plaintiff was then transported to a local hospital to have a rape kit performed. *Id.*, at 91:10-11. Records indicate that seminal fluid was found in Plaintiff's anal cavity, but DNA testing was not requested at that time. *Id.*, at 95:25-96:7.

Plaintiff returned to EMCF later the same day, where he was temporarily housed in intake on psychological observation. *See* Exh. "B," at 97:22-98:14. Plaintiff has not spoken to Wilson since returning from the hospital. *Id.*, at 99:11-13.

Following an investigation conducted by Investigator Ruffin pursuant to the Prison Rape Elimination Act ("PREA"), it was determined that Plaintiff's allegations of sexual assault were

---

[6] Plaintiff testified this encounter with Officer Ford occurred between 8 a.m. and 9 a.m. *See* Exh. "B," at 89:14-22.

[7] Plaintiff presented to medical at approximately 9:15 a.m. *See* Exh. "C," at 26. According to Nurse Hunter, Plaintiff had no outward signs of injury but was referred to the ER for a PREA evaluation. *Id.*, at 25.

unsubstantiated.[8] *See* Exh. "F." A Lauderdale County grand jury chose not to indict Wilson on the sexual assault charges levied against him.[9] *See* Letter from D.A., Exh. "G."

## LAW AND ARGUMENT

### A.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact that the moving party is entitled to judgment as a matter of law." *Chelates Corp. v. Citrate*, 477 U.S. 317, 322 (1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment.  A dispute must be genuine and the facts must be material." *Professional Managers, Inc. v. Faber, Bryan, Hardy and Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). The moving party has a duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on the motion. *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982).

Once a properly supported motion for summary judgment is presented, the non-moving party must rebut with "significant probative evidence." *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1977). In other words, "The non-moving litigant is required to bring forth significant probative evidence demonstrating the existence of a triable issue of fact." *In re:*

---

[8] An incident is deemed "unsubstantiated" where prison officials determine that the infraction may have taken place but there is not enough evidence to conclude that the infraction was committed. *See* EMCF Policy 12.004 ("Ensuring Safe Prisons"), Exh. "H."

[9] Wilson denies sexually assaulting Plaintiff. Wilson testified during his deposition that Plaintiff had told him through tears on the night of the alleged assault that he needed to get off the zone because of debts he owed to other inmates. *See* Exh. "M," at 13:23-15:22, 25:1-26:4. However, any dispute as to whether Wilson sexually assaulted Plaintiff, engaged in consensual sex with Plaintiff, or otherwise is immaterial to Defendant's entitlement to summary judgment.

*Municipal Bond Reporting Anti-Trust Lit.*, 672 F.2d 436, 440 (5th Cir. 1982).

To defend against a proper summary judgment motion, one may not rely on mere denial of material facts, nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. A non-moving party's response, by affidavit or otherwise admissible evidence, must set forth specific facts showing that as to the matter at hand there is a genuine issue of material fact for trial. *Woods*, 687 F.2d at 119.

**B.     Plaintiff has failed to establish a constitutional claim against MTC for failing to protect him from harm**

MTC is treated as a municipality for purposes of Plaintiff's claims against it under § 1983. *See Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 460 (5th Cir. 2003). "The standards applicable to determining liability under § 1983 against a municipal corporation are applicable to determining the liability of a private corporation performing a government function." *J.M. v. Management & Training Corporation*, 2017 WL 3906774, *7 (S.D. Miss. Sept. 5, 2017).

MTC cannot be held liable under Section 1983 on the basis of vicarious liability. *Hinojosa v. Livingston*, 807 F.3d 657, 668 (5th Cir. 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-94 (1978)). "Accordingly, 'isolated unconstitutional actions by municipal employees will almost never trigger liability,' but rather 'the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur.'" *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

"To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.'" *Valle v.*

*City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Monell*, 436 U.S. at 694). To this end, "[a] plaintiff must identify: (1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Id*. at 541-42. These three elements "are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski*, 237 F.3d at 578.

### 1. Plaintiff has not established a deprivation of his constitutional rights

As a preliminary matter, Plaintiff cannot establish municipal liability against MTC as it pertains to his alleged sexual assault because he has failed to demonstrate that his constitutional rights were actually violated.

The failure of prison officials to protect a prisoner from attacks by other prisoners may, under certain circumstances, constitute cruel and unusual punishment in violation of the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). However, not "every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834. "Prisons are necessarily dangerous places," which "house society's most antisocial and violent people in close proximity with one another," thereby making it inevitable that "some level of brutality . . . among prisoners" may occur. *Id*., at 858-59 (Thomas J., concurring). To prevail on a failure-to-protect claim, Plaintiff must show that "he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection." *Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1999) (citing *Newton v. Black*, 133 F.3d 301, 308 (5th Cir. 1998).

"An official is deliberately indifferent when he knows of and disregards an excessive risk to

inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Armstrong v. Price*, 190 F. App'x 350, 352 (5th Cir. 2006). The deliberate indifference standard is "an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5ᵗʰ Cir. 2001). A prison official's mere negligence in failing to protect a prisoner is not actionable under § 1983. *Thompson v. Upshur County, TX*, 245 F.3d 447, 459 (5th Cir. 2001). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference. . . ." *Estate of Davis ex.rel. McCully v. City of N. Richlan Hills*, 406 F.3d 375, 379 (5ᵗʰ Cir.2005). The test for establishing deliberate indifference is "one of subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 837.

Plaintiff testified that he had never had any problems with Wilson prior to the alleged assault on the night of August 1, 2016. Throughout the month that Plaintiff had been on Unit 3-C, he and Wilson had socialized, played cards, watched television, and worked together several hours a day on the same paint crew. In fact, just prior to the alleged assault, Plaintiff, his cell mate, and Wilson were all sitting in Wilson's cell talking and "telling war stories." Wilson had never threatened or made any sexual advances toward Plaintiff, and Plaintiff had no indication the assault was going to occur. Morever, there is no record of Wilson previously assaulting any other inmates during his incarceration with MDOC. Plaintiff testified he has no idea why Wilson assaulted him.

Plaintiff claims that two days before the alleged assault, he told Warden Shaw that there had been several sexual assaults on his zone and that he feared for his safety being housed there. However, Plaintiff testified he did not tell Warden Shaw the names of those involved. Plaintiff testified that he had previously told medical staff that an inmate named "Happy" had assaulted two

other inmates on his zone. However, Happy had never threatened or made any sexual advances toward Plaintiff. Plaintiff also never submitted any "red tags" or requests to be kept separate from any of the other offenders on Unit 3-C.

"A prison official's mere knowledge of vague threats against an inmate is not sufficient to make it clear to the official that such information presents a substantial risk of serious harm to the inmate."[10] *Williams v. Management & Training Corporation*, 2017 WL 8793429, *3 (S.D. Miss. Nov. 2, 2017) (citing *Coleman v. Tanner*, 2010 U.S. Dist. LEXIS 49382, 22-23 (E.D. La. Apr. 27, 2010)). *See also Ward v. Epps*, 2009 U.S. Dist. LEXIS 72038, 19-20 (S.D. Miss. July 22, 2009) (summary judgment granted where plaintiff, who was assaulted by gang members on his housing unit, failed to establish "deliberate indifference" despite evidence that he had sent letters to prison officials reporting general threats against his safety by unspecified gang members); *Klebanowski v. Sheahan*, 540 F.3d 633, 639–41(7th Cir.2008) ("The facts of this case make clear our reason for requiring more than general allegations of fear or the need to be removed. By [plaintiff's] own testimony, the officers knew only that he had been involved in an altercation with three other inmates, and that he wanted a transfer because he feared for his life.... Without these additional facts [concerning subsequent threats] to rely on, there was nothing leading the officers to believe that [plaintiff] himself was not speculating regarding the threat he faced out of fear based on the first

---

[10] This Court has previously noted that "it would be an unreasonable interference with prison administration to rule that prison officials have a duty to house Plaintiff at a facility of his choosing based on his generalized fears." *Williams v. Management & Training Corporation*, 2017 WL 8793429, *3 n. 4 (S.D. Miss. Nov. 2, 2017), citing *Jones v. U.S.*, 534 F.2d 53, 54 (5th Cir. 1976) (prison officials have broad discretion, free from judicial interference, in determining prisoner assignments); *Kahey v. Jones*, 836 F.2d 948, 950 (5th Cir. 1988) (courts defer to prison administrators concerning day-to-day prison operations); *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983) (prisoners have no constitutional right to be incarcerated in a certain facility).

attack he suffered. This lack of specificity falls below the required notice an officer must have for liability to attach for deliberate indifference.").

There is no evidence whatsoever that prison officials were subjectively aware of a substantial threat of serious physical harm to Plaintiff's safety, or that any of them were deliberately indifferent toward the same.

### 2.    Plaintiff has not established corporate liability based on official policy

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "These are actions for which the municipality is actually responsible." *Id.* (quotation omitted).

Plaintiff has failed to identify any corporate policy adopted by an MTC policy-maker that was the "moving force" behind a deprivation of his constitutional rights. At the time of the alleged incident, EMCF – under the management of MTC – was accredited under the standards adopted by the American Correctional Association ("ACA") for the operation of an adult correctional institution. *See* ACA Certificate, Exh. "I." MTC and EMCF were also found to have met all standards for compliance during a 2015 audit conducted by the U.S. Department of Justice's National PREA[11] Resource Center. *See* PREA Audit, Exh. "J." A significant component of these accreditation audits involved a review of MTC's policies and procedures, as well as its training, supervision, and discipline of staff.

One example of the policies implemented by MTC to prevent sexual violence at EMCF is Policy No. 12.004, titled "Ensuring Safe Prisons" (adopted October 2014). *See* Exh. "H." It states

---

[11] Prison Rape Elimination Act ("PREA").

that EMCF "is committed to a zero-tolerance standard for sexual violence, sexual misconduct and sexual harassment." *Id*. This policy provides for offender orientation and education regarding sexual violence, including prevention, self-protection, reporting, and treatment; staff orientation and training, including pre-service training related to prevention, detection, response, and investigation of offender on offender sexual violence; provisions for at-risk or sexually aggressive inmates; investigations of reported sexual violence; and medical and mental health treatment for victims. *Id*.

Another example includes post orders implemented by MTC regarding the duties of security personnel on each housing unit, which include instructions for count procedures, securing each zone, monitoring offender behavior, reporting unusual incidents and activities, and safety inspections. *See* Post Orders, Exh. "K."

Plaintiff has failed to identify in his Complaint or through discovery any unconstitutional, officially adopted policy of MTC, nor can he demonstrate that any MTC policy caused a deprivation of his constitutional rights.

### 3. Plaintiff has not established corporate liability based upon pattern or practice

Plaintiff also has failed to establish that MTC had an official custom or practice of failing to protect inmates at EMCF from sexual abuse sufficient to establish municipal liability against it under §1983.

In order to prove official policy through pattern and practice, a plaintiff must demonstrate that there existed "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Hicks-Fields v. Harris Cty., Texas*, 860 F.3d 803, 808 (5th Cir. 2017) (quotation omitted). A plaintiff must also establish "actual or

constructive knowledge of such custom by the municipality or the official who had policymaking authority." *Id*. (quotation omitted).

"A pattern is tantamount to official policy when it is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 578). A plaintiff must demonstrate a pattern of sufficiently similar and numerous prior abuses that transcends a single error, and "[w]here prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Id*., at 850-51 (quotation omitted). "A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Id*. at 851 (quotation omitted).

Plaintiff's Amended Complaint contains a list of alleged "unwritten policies, customs and practices" that he claims caused a deprivation of his constitutional rights. *See* Doc. [34], ¶ 16. Many of the alleged customs and practices listed in the Amended Complaint have nothing whatsoever to do with this case. Regardless, Plaintiff has failed to produce sufficient evidence of prior, similar incidents so persistent and pervasive to establish an official policy of MTC, nor has he demonstrated that any such policy was the moving force behind the alleged deprivation of his constitutional rights.

For instance, the Amended Complaint alleges a custom or practice of "condoning or allowing gangs to sexually assault other inmates." *See* Doc. [34], ¶ 16(b). However, Plaintiff testified that neither he nor his alleged assailant were gang-affiliated at the time of the subject incident. *See* Exh. "B," at 67:25-68:6. There is no evidence whatsoever this incident was gang-related, much less that

MTC had a practice of allowing gang members to sexually assault other inmates.

The Amended Complaint also alleges a custom or practice of "inadequate and improper procedures and practices in screening, hiring, training, supervising and disciplining officers who practice, condone or use excessive force upon EMCF inmates, or allow inmates to sexually assault other inmates, including the Plaintiff." *See* Doc. [34], ¶16(c). It further alleges a practice of "condoning and allowing EMCF correctional officers to allow inmates to commit sexual assaults on other inmates." *Id.*, at ¶16(f). First, there is no allegation in this case that any officer used excessive force on Plaintiff. Second, there is no evidence of any correctional officer "allowing" inmates to sexually assault Plaintiff or others, much less that there was a persistent, widespread practice of such conduct of which MTC had notice sufficient to establish an official policy.

The Amended Complaint further alleges "inadequate and improper procedures, policies and practices for investigating improper activities by EMCF correctional officers and gangs ..." *See* Doc. [34], at ¶ 16(d). This unsupported allegation also does not appear germane to this case. There are no allegations or other evidence that a failure to investigate "improper activities" by officers or gang members led to Plaintiff being sexually assaulted by someone he thought was his friend.

The Amended Complaint further alleges a practice of "failing to prevent and/or investigate allegations of improper relationships between EMCF correctional officers and EMCF inmates which directly led to the June 17, 2010 assault in Unit 6." *See* Doc. [34], at ¶ 16(g). This allegation clearly has nothing to do with the facts of this case.

The Amended Complaint further alleges a practice of "failing to conduct routine cell checks." *See* Doc. [34], at ¶ 16(h). MTC policy requires certified counts to be conducted after each shift change at 8 a.m., 4 p.m., and midnight. *See* Post Orders, Exh. "K." Formal counts also are conducted

every two hours between 10 a.m. and 10 p.m., and every hour between 10 p.m. and 5 a.m. *Id*. Additionally, informal counts are performed on an hourly, unscheduled basis in general population units, such as Unit 3. *See* Exh. "L" (Policy No. 903A.06, ¶ E(3)). In addition to these routine counts required by official policy, an officer was stationed in the Unit 3 control tower to monitor each zone through security video, while two additional officers were on the floor to address inmate needs across the unit. Plaintiff testified that on Unit 3-C, officers conducted certified count three times a day, but they often performed only one or two additional counts during each shift. *See* Exh. "B," at 43:11-12, 45:2-14. He testified informal security checks were rarely done, though officers often came to the zone to escort inmates to medical or other appointments.[12] *Id*., at 45:18-46:1.

Even if Plaintiff could prove that officers on Unit 3 did not perform formal or informal counts as often as required by MTC policy during the one month he was housed there, he has not shown that any official policymaker for MTC had notice of this deficiency or that it occurred with such regularity over a period of time sufficient to constitute an official policy. Furthermore, Plaintiff cannot demonstrate that any such policy actually caused a deprivation of his constitutional rights. Plaintiff testified that he had never had any prior problems with Wilson and that they often socialized together. The incident occurred during a time when inmates were free to be out of their cells. Plaintiff further testified that the assault was sudden and without warning, and that it lasted a matter of minutes. There is no evidence whatsoever that having an officer come onto Plaintiff's zone at least once per hour, as required by MTC policy, would have prevented the alleged assault from occurring.

The Amended Complaint also alleges a practice of "allowing inmates to leave their cells

---

[12] Wilson testified that security guards usually conducted security checks on Unit 3-C "about every hour." *See* Exh. "M," at 34:21-35:15. He could not recall a time period where that was not the case. *Id*., at 35:16-18.

freely due to faulty locks on the cell doors." *See* Doc. [34], at ¶ 16(i). This unsubstantiated allegation is not germane to this case. Plaintiff claims the alleged assault occurred during a time when inmates were free to leave their cells.

### 4. Plaintiff has not established an official custom or practice of failing to train or supervise security personnel sufficient to create corporate liability

The Amended Complaint broadly alleges MTC had an unwritten policy, custom, or practice of "inadequate and improper training, supervision and discipline of EMCF corrections officers." *See* Doc. [34], ¶ 16(a).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. "[A] municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id*. (quotation omitted). "Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *Id*.

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. (quotation omitted). Thus, when a municipality's's policymakers "are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* In such a situation, the Supreme Court has held that "[t]he city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Id.*, at 61-62 (quotation omitted). "A less stringent standard of fault for a failure-to-train claim would result in de facto *respondeat superior* liability on municipalities...."

*Id.*, at 62 (quotation omitted).

For purposes of a failure-to-train claim under § 1983, a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference. *Id.* "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Id.* (quotation omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* For these same reasons, the Fifth Circuit has required "actual or constructive notice of ongoing constitutional violations" when municipal liability is premised upon failure to supervise staff. *Yara v. Perryton Indep. Sch. Dist.*, 560 Fed.Appx. 356, 360 (5th Cir. 2014); *see also Clyce v. Hunt Cty., Tex.*, 515 Fed.Appx. 319, 323 (5th Cir. 2013) (applying same elements for failure-to-train and failure-to-supervise claims). Evidence that officers "either completely disregarded their training or perhaps did not fully comprehend it" is insufficient to show deliberate indifference or the existence of a policy or practice of failure to train. *J.M.*, 2017 WL 3906774, at 13.

MTC's training standards at EMCF are in accordance with the standards adopted by the American Correctional Association. *See* MTC Policy Excerpts, Exh. "L" (Policy 901D.02). MTC's requirements include pre-service training for new employees. *Id.* Additionally, all new correctional officers must complete a total of 120 hours of training within their first year on topics such as security and safety procedures, supervision of offenders, use of force, offender rights, interpersonal relations, communication skills, suicide prevention, standards of conduct, cultural awareness, sexual

abuse and assault intervention, and code of ethics. *Id*. All correctional officers also are required to complete 40 hours of in-service training per year on various issues, including supervision of offenders and training on sexual abuse and assault. *Id*. MTC specifically trains its employees on its zero-tolerance policy for sexual abuse and harassment; the right of inmates to be free from sexual abuse and harassment; and the dynamics of sexual abuse in confinement. *Id*.; *see also* Exh "H" ("Ensuring Safe Prisons").

Furthermore, as discussed *supra*, MTC's training standards and practices have been audited and approved by the American Correctional Association and the U.S. Department of Justice's National PREA Resource Center. *See* Exh. "I"; Exh. "J."

Plaintiff has failed to present any evidence from which a reasonable jury could conclude that MTC failed to provide reasonable training to its employees on issues relevant to this case, such as the Prison Rape Elimination Act ("PREA") or offender supervision. Plaintiff likewise has failed to demonstrate that MTC had actual or constructive notice of a deficiency in its training program that was likely to cause a deprivation of his constitutional rights, sufficient to establish deliberate indifference. Plaintiff has not produced any evidence of prior constitutional violations by untrained employees similar to the facts of this case. Accordingly, Plaintiff's claim that MTC had a policy or practice of inadequate training and supervision is without merit.

### C. Plaintiff has failed to establish that he was injured due to any negligence of MTC or its employees

Plaintiff asserts a state law claim for negligent hiring and supervision, stating in his Amended Complaint as follows:

> Plaintiff alleges Defendants MTC and Doe Defendants 1-100 negligently hired, supervised, and retained its employees, inter alia, by a) failing to

care for and ensure the Plaintiff's safety while at EMCF; b) properly train, supervise, discipline, retain, hire, and/or discharge its employees agents, and/or representatives; and c) were otherwise negligent in their care and treatment of the Plaintiff, and as a direct and proximate result, the Plaintiff sustained the harms alleged herein.

*See* Doc. [34], ¶ 17. Plaintiff also asserts a claim against MTC for *respondeat superior* for the allegedly negligent acts or omissions of its employees in "allowing or failing to prevent the Plaintiff's physical and sexual assault on or about August 1, 2016." *Id.*, at ¶ 18-19.

The elements of negligence under Mississippi law are well settled: "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) damages; and (4) a causal connection between the breach and the damages, such that the breach is the proximate cause of the damages." *Grisham v. John Q. Long V.F.W. Post, No. 4057, Inc.*, 519 So.2d 413, 416 (Miss. 1988) (citations omitted). "Negligence is the failure to do what a reasonable person would do under the same or similar circumstances, resulting in a breach of the applicable standard of care and injury to the plaintiff." *Irby By and Through Collins v. Madakasira*, 2017 WL 1164219, *3 (Miss. Ct. App. 2017) (citations omitted).

Prison officials generally have a duty to protect inmates from violence by fellow inmates. *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006). In this case, Plaintiff has failed to present evidence that MTC's security personnel breached that duty or that any such breach was the proximate cause of Plaintiff's alleged injuries.

## 1. Negligent hiring and supervision

Plaintiff has failed to identify any employees which were unreasonably hired, nor has Plaintiff presented any evidence to demonstrate that the training and supervision implemented by MTC was in any way deficient. As discussed *supra*, MTC requires pre-service training for all new

employees. All correctional officers also must complete 120 hours of training within their first year on topics such as security and safety procedures, supervision of offenders, use of force, offender rights, interpersonal relations, communication skills, suicide prevention, standards of conduct, cultural awareness, sexual abuse and assault intervention, and code of ethics. All correctional officers are subsequently required to complete at least 40 hours of in-service training each year, including training on sexual abuse and assault. MTC's training on sexual abuse and PREA issues is extensive. Again, MTC's training standards were a significant component in EMCF's accreditation by the ACA and the U.S. Department of Justice's National PREA Resource Center in 2015.

Because Plaintiff cannot demonstrate that MTC's hiring, training, or supervision was deficient, or that any such deficiency was a proximate cause of his alleged assault, Plaintiff's claims against MTC in that regard should be dismissed as a matter of law.

### 2. Respondeat Superior

Plaintiff testified that prior to the subject assault, he had never had any prior problems with Wilson. They had spent considerable time together socializing, playing cards, watching television, and working several hours a day on the same paint crew. Wilson had never made any threats or sexual advances toward Plaintiff, and Plaintiff had never reported any problems with Wilson to prison officials. Furthermore, there is no record of Wilson previously assaulting any other inmates, much less engaging in sexual abuse. It was not reasonably foreseeable to prison officials that Wilson posed any threat of harm to Plaintiff or that Plaintiff and Wilson needed to be separated.

Although Plaintiff had previously reported to medical staff that an inmate named "Happy" had sexually assaulted two other inmates on his zone and that he did not feel safe being housed there, Plaintiff testified that Happy had never threatened or made any sexual advances toward him. Plaintiff

also never submitted any red tags, or requests to be separated, as to any of the inmates housed on Unit 3-C. It was not reasonably foreseeable to prison officials – based on Plaintiff's vague, generalized complaints of fear – that Plaintiff was at risk of being harmed by other inmates.

Additionally, although Plaintiff generally alleges that security officers did not conduct security checks as frequently as required under MTC policy, any such deficiency was not a proximate cause of the assault in question. MTC policy requires officers to conduct a certified count following each shift change, at 7 a.m., 4 p.m., and 11 p.m. MTC policy further requires a formal count at 10 a.m., noon, 2 p.m., 6 p.m., 8 p.m., 10 p.m., and hourly between 11 p.m. and 5 a.m. MTC policy further requires officers to conduct informal, unscheduled counts on an hourly basis. Plaintiff testified that although officers conducted certified count, they usually only conducted on or two additional counts on his zone during each shift. However, at the time of the alleged incident, there was an officer posted in the Unit 3 control tower who could see into each zone through the windows and could also monitor each zone through security cameras. There was also a sergeant and a correctional officer assigned to the floor on Unit 3. It is undisputed that Plaintiff's zone was being monitored at the time of the alleged assault. The alleged assault also occurred during a time when inmates were free to leave their cells and socialize with other inmates on their zone. According to Plaintiff, the assault occurred suddenly and without warning, lasted only a matter of minutes, and occurred in Wilson's cell outside the view of the security cameras on his zone. Plaintiff testified there were no witnesses – inmates or otherwise – to the alleged assault. Plaintiff cannot demonstrate that officers conducting security checks every hour instead of every two hours would have prevented the subject assault from occurring.

Because Plaintiff cannot establish that any MTC employees breached a duty they owed to

Plaintiff or that any such breach was a proximate cause of Plaintiff's injuries, his claims against MTC for *respondeat superior* fail as a matter of law.

**D.  Plaintiff cannot establish a claim for punitive damages**

To recover on a claim for punitive damages in Mississippi, Plaintiff must "prove by and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." MISS. CODE ANN. § 11-1-65(1)(a). Plaintiff must demonstrate the breach was "the result of an intentional wrong or that a defendant acted maliciously or with reckless disregard of the plaintiff's rights." *Daniels v. Crocker*, 235 So. 3d 1, (Miss. 2017) (quotation omitted). "An award of punitive damages is an extraordinary remedy, reserved for the most egregious cases, and designed to discourage similar misconduct." *Pursue Energy Corp. v. Abernathy*, 77 S. 3d 1094, 1101 (Miss. 2011).

Based on the evidence before the Court, as discussed *supra*, Plaintiff has failed to present any evidence that would allow a jury to find that the conduct of MTC or its employees rises to the level of actual malice or gross negligence evincing a willful, wanton, or reckless disregard for Plaintiff's safety. Accordingly, Plaintiff's claim against MTC for punitive damages should be dismissed as a matter of law.

**<u>CONCLUSION</u>**

For all of the foregoing reasons, Plaintiff has failed to establish a genuine issue of material fact as to any of his claims against Management & Training Corporation. Accordingly, this Defendant is entitled to judgment as a matter of law.

Respectfully submitted, this the 13th day of July, 2018.

MANAGEMENT & TRAINING CORPORATION,
DEFENDANT

BY:    */s/  Steven J. Griffin*          
            OF COUNSEL

ROY A. SMITH, JR. - BAR # 7599
rsmith@danielcoker.com
STEVEN J. GRIFFIN - BAR # 103218
sgriffin@danielcoker.com
DANIEL COKER HORTON AND BELL, P.A.
4400 OLD CANTON ROAD, SUITE 400
POST OFFICE BOX 1084
JACKSON, MISSISSIPPI 39215-1084
TELEPHONE: (601) 969-7607
FACSIMILE: (601) 969-1116

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that on July 13, 2018, I electronically filed the foregoing with the Clerk of

the Court using the ECF system, which provided notice to the following counsel of record:

        Kelly M. Williams
        kwilliams@sellerslawfirm.net

        *Attorney for Plaintiff*

        */s/ Steven J. Griffin*